## THE GRACE SEYMOUR.

### THE EDWIN REED.

### FULTON v. THE GRACE SEYMOUR.

### HANSCOM v. THE EDWIN REED.

(District Court, S. D. New York. July 19, 1894.)

COLLISION—SAIL VESSELS—RIGHT OF WAY—LOOKOUT—LUFF IN EXTREMIS.

The night was moonlight; the wind, N. N. W. The bark R., deeply laden, headed east, and the schooner S., sailing light, headed each a point free of the wind, and making five to six knots, were approaching one another. Each had seen the other's sails two miles off on the lee bow. The bark's pilot could not see ahead, and the watch noticed no more of the

schooner until her red light was close aboard, though it must have been steadily visible for five to seven minutes. There was evidence that the officer of the watch was busy with other things. Both vessels then ported hard, and the schooner luffed two points, and received a glancing blow. *Held,* that since the bark was on the port tack, with a free wind, it was her duty to keep out of the way, and that she had failed in this by reason of neglect to keep a proper, continuous lookout.

Libels by Allen Fulton against the schooner Grace Seymour and by Howard H. Hanscom against the bark Edwin Reed. The first dismissed, and a decree allowed on the second.

Wing, Shoudy & Putnam and Mr. Burlingham, for the Edwin Reed.

Owen, Gray & Sturges, for the Grace Seymour.

BROWN, District Judge. The above libels were filed to recover the damages sustained by the bark Edwin Reed and the schooner Grace Seymour through a collision between those vessels which occurred at about 10 p. m. of November 30, 1892, in Long Island Sound about two miles west of Norwalk island.

The night was clear, with moonlight; the wind, about N. N. W., and the sea light. The bark was of 1,164 tons burden, about 240 feet long, deeply loaded, and drew 21 feet. She had been previously heading about N. E. by E. ¾ E., and was in charge of a pilot. The Seymour was a three-masted schooner, of about 600 tons burden, 167 feet long, sailing light, drawing but 8 feet of water, and she was heading about west. Each was making from five to six knots per hour. The sails of each were first seen by the other when they were at least two miles apart, and on the lee bow of each. Just before collision each ported hard; the schooner luffed, as I find, about two points before collision, and the bark paid off probably not over half a point; so that at collision the bark's port bow struck the schooner's port side just aft of the fore rigging, by a glancing blow, which raked her fore and aft, and started several knees, timbers, and plank sheer, but without breaking any hole in her side. The bark's port cathead and anchor caught and carried away the schooner's fore rigging and sails, and having got foul carried the schooner astern along with her. The bark had her jibboom broken and sustained some other damages. The schooner being to windward dropped her anchor, and after an hour the bark drifted clear.

The bark contends that the collision was caused by the schooner's luff; the schooner contends that the luff was in extremis, to ease the blow, and that the bark was solely in fault, in not keeping out of the way.

The pilot testifies that the bark was not sailing close-hauled, and the other evidence satisfies me that she was one point free. I think the schooner also had the wind one point free. This, however, is immaterial; because the bark, being on the port tack and also having a free wind, was bound by the rules to keep out of the way of the schooner, which was on the starboard tack, and was bound to keep her course.

I am persuaded from a careful consideration of all the testimony, that the sole blame for this collision rests with the bark, by reason of her failure to keep a proper, continuous lookout; and by reason of the preoccupation of the first mate, who was the officer in charge of the deck, with the duty of superintending the seamen on the forecastle in heaving on the windlass, and taking care of the bars, ropes, etc., on the forecastle; so that the necessary attention was not given to the schooner, or to the navigation of the bark, so as to enable her to perform her duty to avoid the schooner. The bark was so high forward that the pilot and seaman at the wheel could see nothing ahead; and though one or more reports of the schooner were made by the lookout on the bark, the first mate, who was forward, did not give even a look at the schooner until the last moments, at or near the time when she luffed to avoid immediate collision. The lookout also, after first seeing and reporting the schooner's sails bearing a little on the bark's starboard (lee) bow, and not long afterwards reporting what he thought was a dim green light on the same bearing, paid no further attention to the schooner until her red light was seen to be very near, about the time she luffed; the bark's wheel was then ordered, and put, hard-a-port, but too late to avoid collision.

In the meantime, the bark had been showing to the schooner, whose officers and men were attentively observing her movements, first, her green light, then the red only, then the green, then the red, and last, when very near, the green again. These lights were always seen about a point on the schooner's port (lee) bow, as the witnesses testify, and without much change of bearing. Even if the schooner's green light was seen at all, which I greatly doubt from the courses of the two vessels, there must, nevertheless, have been a very considerable interval of from five to seven minutes at least during which her red light was steadily visible to the bark, i. e. showing twice on the bark's starboard bow, and twice a little on her port bow (in consequence, no doubt, of the bark's own changes), during all which time this red light of the schooner was not seen by the bark at all, because no continued attention was paid to the schooner; and it was not seen until the vessels were close aboard, within two or three lengths at furthest, too late for any effectual maneuvers.

The situation was one that made careful observation by the bark necessary. The schooner, from the time at least that she was a mile and a half away, was showing her red light, and showing it mostly to the bark's green light. The headings of the two vessels differed only $2\frac{1}{4}$ points from opposite; while the combined leeway of the two amounted probably to at least $1\frac{1}{2}$ points, the bark's leeway being probably about $\frac{1}{3}$ that of the schooner; so that their actual courses, from the first, differed from opposite by less than a point. Each was thus all the time heading to windward of the other, except when the bark yawed enough (say about one point) to show her red light. The fact that there was no substantial change in the bearing of the lights, as the vessels came nearer to each other, would have made it obvious to the bark, had any con-

tinuous watch of the schooner been kept up, that decided and timely maneuvers were necessary on her part in order to perform her duty to keep out of the schooner's way. Through the bark's inattention, nothing was done by her until too late. The fault of the bark is plain and inexcusable.

I see no sufficient ground for holding the schooner chargeable with legal fault, even if her final luff was a mistake, which is by no means certain. The bark's evidence on that point is entitled to very little weight, as after the first light seen by her there was no observation of the schooner till collision was imminent. The bark's exhibition of her red light twice, was indicative of her intent to go to leeward. It was not until the bark's last change to green, when quite near, and when she seemed coming straight upon the schooner's course after two contradictory changes, that the schooner luffed. The situation was threatening in the extreme. It was brought about by the gross fault of the bark, continued down to within a few moments of collision,—faults that baffled all calculation by the schooner as to the bark's intent; so that even if the schooner's luff was a mistake, the bark would be precluded from taking advantage of it, as it was done in extremis. The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468.

The bark contends that the schooner luffed four points. This is improbable. Her wheelman says he noticed the compass just at collision, and that the change was but two points, her heading being then W. N. W. The blow was certainly a glancing one, and it seems improbable that the angle of collision was as much even as four points; if so much as that, the great weight and force of the bark would, I think, have broken a hole in the schooner's hull, instead of raking' along her side; and if the angle of collision did not exceed four points, supposing the bark to have paid off only a half point before collision, which is as much as her testimony will admit, the schooner could not have headed at collision north of W. N. W. She was liable to make so much leeway, being light (one to one-half point says the master) that I credit the positive testimony that her previous heading was west. Her luff, therefore, was not over two points; and a luff of only two points would make very little change in her actual position, as a drawing of the curve will show,—a difference, I think, insufficient, as the schooner's witnesses testify, to have avoided the collision. Considering the bark's gross fault, the schooner cannot be held unless her fault is clear; and this is not made out. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211.

The libel against the Seymour is, therefore, dismissed, with costs, and a decree allowed against the E. Reed, with costs.